## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**DONTEZ HOLLIS, et al.,**

        **Plaintiffs,**

                                **Case No. 1:19-cv-436**

        **v.**                        **JUDGE DOUGLAS R. COLE**

**RONALD ERDOS, et al.,**

        **Defendants.**

### OPINION AND ORDER

This cause comes before the Court on Defendants' Motion for Judgment on the Pleadings (Doc. 12) and Plaintiffs' Motion for Leave to File an Amended Complaint (Doc. 19). For the following reasons, the Court **DENIES IN PART** and **GRANTS IN PART** Defendants' Motion and **GRANTS** Plaintiffs' Motion.

### BACKGROUND

For purposes of the present motions, the Court accepts as true the following facts, which are set forth in Plaintiffs' Complaint filed June 7, 2019. (*See* Compl., Doc. 1, #1–21[1]). Plaintiff Dontez Hollis ("Hollis") was formerly incarcerated in the Southern Ohio Correctional Facility ("SOCF"), but at the time this proceeding was initiated, he had been released. (Compl. at ¶ 5, #3). Plaintiff Darryl Pascol ("Pascol") is currently incarcerated at the Madison Correctional Institution, but at the time of the alleged events, was also housed at SOCF. (*Id.* at ¶ 6, #4).

---

[1] Refers to PageID number.

### A.    The June 4, 2017 Stabbing.

Hollis's and Pascol's claims all stem from an alleged stabbing that occurred while they were incarcerated at SOCF. On June 4, 2017, Hollis and Pascol were permitted to leave their respective cells for recreation time. (*Id.* at ¶ 16, #5). Usually, before inmates are permitted out of their cells for recreational time, they are strip-searched by corrections officers, which is the "normal procedure" at SOCF. (*Id.* at ¶¶ 16–17, #5–6). That day, however, Hollis and Pascol were "not strip searched or thoroughly frisked" before being let out for recreation time. (*Id.* at ¶ 19, #6). Once outside their cells, Hollis and Pascol were "handcuffed to a table," which allowed them "only a few inches of hand movement," but that was enough mobility to play cards with the two other inmates also handcuffed to the table. (*Id.* at ¶¶ 19–20).

While the four men were "peacefully playing spades[,]" Hollis and Pascol observed two corrections officers, Defendant Officers Faye ("Officer Faye") and Dalton ("Officer Dalton") talking to another inmate, Gregory Reinke ("Reinke"), who was still in his cell. (*Id.* at ¶¶ 22–23). They allege that Reinke is "a Caucasian inmate" and "known white supremacist and member of the Aryan Brotherhood gang." (*Id.* at ¶ 24). Hollis and Pascol imply that they are African American. (*Id.* at ¶ 25 ("Defendant Officers took Reinke out of his cell and placed him at a table next to the table Mr. Hollis and Mr. Pascol and the other African American inmates were playing cards.")).

Hollis and Pascol then allege that Officers Faye and Dalton, after similarly failing to strip search Reinke, but "before placing [him] at the table next to the Plaintiffs," either gave Reinke, or knew or should have known that Reinke had, a key or some "other device" that would permit him to remove his handcuffs. (*Id.* at ¶ 26,

#6–7). Reinke, because he had this "key" or "other device," was able to, "about 20-30 minutes" later, "unlock his handcuffs[,]" "pull[] an 8-inch blade out of his sock[,]" and begin stabbing or attempting to stab Hollis, Pascol, and the two other inmates at their table. (*Id.* at ¶ 29, #7). Still handcuffed to the table, Hollis and Pascol were initially unable to defend themselves, but Hollis eventually "pull[ed] his hands out of the handcuffs" and "tackled Reinke to the ground." (*Id.* at ¶ 39, #8). Before that happened, though, Reinke had already stabbed Pascol and the two other inmates several times. (*Id.* at ¶¶ 33–34, #7).

Hollis and Pascol allege that Officers Dalton and Faye did not immediately respond to the attack. Instead, they allege the Officers "stood and watched" from "ten feet away behind a locked door[,]" and "laughed" as Reinke carried out the attack. (*Id.* at ¶¶ 35–38, #7–8). Only after Hollis freed himself did Officers Dalton and Faye intervene, and even then, they allegedly did so by pepper spraying Hollis, not Reinke. (*Id.* at ¶¶ 40–42, #8).

Hollis and Pascol further allege that while Pascol and the other inmates were "bleeding out with severe injuries," Officers Faye and Dalton did not provide first aid, but again "just stood and watched." (*Id.* at ¶¶ 43, 45). They also allege that Defendant John Doe Sergeant ("Sergeant John Doe") was present "after the stabbing" and "did not provide any first aid[,]" "direct any other else [sic] to provide first aid[,]" and "attempted to prevent and deny" the inmates from getting proper medical attention. (*Id.* at ¶¶ 46–47, #8–9). In fact, they allege Officers Faye, Dalton, and Sergeant John

3

Doe said to each other "'we should just let them die[,]'" in reference to Pascol and the two other inmates who Reinke stabbed. (*Id.* at ¶ 48, #9).

Hollis and Pascol allege it took "at least ten minutes" for "the nurses from health care" to arrive and begin administering first aid. (*Id.* at ¶ 49). Pascol was life flighted to The Ohio State University hospital; Hollis was injured escaping his handcuffs and in the ensuing struggle, but was apparently treated at SOCF. (*Id.* at ¶¶ 50–51). Hollis alleges he filed his grievance shortly after the incident; Pascol alleges he filed his grievance "as soon as [he] was taken off life support." (*Id.* at ¶¶ 58–59, #10).

## B.   Hollis And Pascol's Complaint.

The two men subsequently filed suit against Officers Faye, Dalton, Warden Ronald Erdos ("Warden"), Sergeant John Doe, and John Doe Nurses and Corrections Officers. They assert six counts, all of which arise under 42 U.S.C. § 1983.[2] Two of the claims, though, Count I and Count VI, are of particular importance to the pending Motion for Judgment on the Pleadings. That is because those two claims are the only ones that are asserted in whole (Count VI), or in part (Count I), against the Warden in his personal capacity.

In terms of their claims against the Warden, Hollis and Pascol make several conclusory allegations in the background section of their Complaint. Specifically, they claim that Reinke was a "known threat of violence in the prison," had a history of

---

[2] Although Hollis and Pascol name John Doe Nurses and John Doe Corrections Officers in the Complaint, they do not specify which counts, if any, are asserted against those unnamed defendants.

"misconduct and violence[,]" that he was "known by Defendant Warden and the staff … to carry shanks in violation of prison rules[,]" and that he had "been caught with shanks and/or knives on at least five different occasions." (Compl. at ¶¶ 53–56, #9). Specifically, they allege that Reinke "attempted to stab inmates on at least two other occasions prior to" this incident. (*Id.* at ¶ 56, #10). They further allege Reinke was "a threat to the safety of others," but claim the Warden "did nothing to prevent" this attack and that he "failed to train and supervise his subordinates" and "implicitly approved, authorized, or acquiesced" to unconstitutional behavior by the other Defendants. (*Id.* at ¶ 57, #10).

Based on these, and other, allegations, in Count I of the Complaint, Hollis and Pascol allege that three Defendants—Faye, Dalton, and the Warden—violated their Eighth Amendment rights by failing to protect them from Reinke's attack. Importantly, they do not allege that the Warden was present when the attack occurred, or in any way encouraged or directed the conduct of the corrections officers in connection with this particular event. Rather, picking up on the theme from the background allegations, they claim that the Warden knew of the risks that Reinke presented, but that he was deliberately indifferent to those risks. (*Id.* at ¶ 74, #12).

In Count VI, labeled "Supervisory Individual Liability" and directed solely at the Warden, Hollis and Pascol allege that the Warden "was responsible for the supervision, discipline, and control of all Southern Ohio Correctional Facility correctional officers," and that he "at least implicitly approved, authorized, or acquiesced in his/her [sic] subordinates' misconduct." (*Id.* at ¶ 122, #19). They further

5

allege that, "[d]espite [the Warden's] knowledge of a threat to inmate safety, Defendant Warden did not train and supervise Defendant Officers on dealing with inmates who pose a threat to other inmates' safety." (*Id.* at ¶ 125, #20). Once again, though, they do not allege that the Warden was in any way directly involved with this specific incident, other than that it followed from his alleged failure to train and supervise generally.

## PENDING MOTIONS

On August 20, 2019, the Defendants filed their Answer (Doc. 6) and on October 2, 2019, they filed a Motion for Judgment on the Pleadings. (Defs.' Mot. for J. on the Pleadings ("Defs.' Mot."), Doc. 12, #62–75). While the Defendants' Motion was pending, Hollis and Pascol filed a Motion for Leave to Amend their Complaint. (Pls.' Mot. for Leave to Am. Compl. ("Pls.' Mot."), Doc. 19, #122–25). Since that time, the parties have moved forward with discovery.

## A.    Motion For Judgment On The Pleadings.

Defendants make two principal arguments in their Motion. First, they argue that all six counts set forth in the Complaint are barred by Ohio's two-year statute of limitations, as the Complaint was filed three days after that two-year limitations period expired. (Defs.' Mot. at #63). Second, in the event the entire Complaint is not untimely, Defendants argue that Hollis and Pascol fail to state a viable personal-capacity claim under 42 U.S.C. § 1983 against the Warden (either under Count I or Count VI) because there is no "respondent [sic] superior" liability under that statute. (*Id.*).

Hollis and Pascol disagree. First, they argue that their claims are timely because the Prison Litigation Reform Act tolled the statute of limitations while they exhausted their administrative remedies. (Pls.' Resp. in Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Doc. 13, #80). Second, they argue that the claim against the Warden is viable because they are making a supervisory liability claim, namely that he "'approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate[s].'" (*Id.* at #84 (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995))). This, they argue, is based on the fact that the Warden both failed to train and supervise corrections officers and that he knew or should have known that Reinke had a propensity for violence and stabbing inmates, based on Reinke's prior conduct. (*Id.* at #86).

## B.  Motion For Leave To File Amended Complaint.

On January 15, 2020, Hollis and Pascol filed a Motion for Leave to Amend their initial Complaint. (Pls.' Mot. at #122). Rather than attaching the proposed Amended Complaint, the Motion requested leave to file such a complaint within forty-five days from the date of that Motion, or, in other words, by Saturday, February 29, 2020. The Motion suggests that the sole purpose of the proposed amendment was to identify some of the John Doe defendants. (*See id.*).

Defendants objected to this Motion on two grounds. First, they argued that Hollis and Pascol were required to, but did not, attach their amended complaint to that Motion. (Defs.' Resp. in Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Doc. 21, #168–69). Second, they claimed that it would be futile to seek to add new defendants at this

point, in place of the John Doe defendants, as the statute of limitations has run on any such claims. (*Id.* at #169–70). In response, Hollis and Pascol agreed that they are seeking "to add new parties[,]" but argued that they should be permitted to do so because the new parties "have received satisfactory notice." (Pls.' Reply to Defs.' Opp'n ("Pls.' Reply"), Doc. 22, #173). Hollis and Pascol did not file a proposed amended complaint by February 29, 2020.

The current procedural posture leaves the Court at somewhat of a disadvantage. Defendants have moved for judgment on the pleadings, but Plaintiffs have filed a motion for leave to amend their Complaint. Given the lack of an actual proposed amended complaint, the Court is left to guess at the substance of that proposed pleading. That being said, the Court will take Hollis and Pascol at their word, and assume that any proposed amendments would go only to identifying named defendants to replace John Doe defendants, but would not otherwise change the substance of their claims. Thus understood, any such amendment would not impact the two arguments that Defendants advance in their Motion for Judgment on the Pleadings. Accordingly, the Court will first consider the Defendants' challenge to the extant pleading, and then turn to the question of whether leave to amend to add new parties is appropriate.

## LAW AND ANALYSIS

### A.  Standard Of Review.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is analyzed in the same manner as a motion to dismiss under Rule 12(b)(6). *See*

*Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008). This means all factual allegations in the complaint are construed in a light most favorable to the plaintiff, with all their allegations accepted as true, and all reasonable inferences drawn in their favor. *See Bullington v. Bedford Cty.*, 905 F.3d 467, 469 (6th Cir. 2018). All a plaintiff need do is provide "a short and plain statement of the claim showing that the pleader is intitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).

But that short and plain statement must offer more than mere "labels and conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "'[A] formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). There must be "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). This means a complaint must contain "either direct or inferential allegations respecting all material elements to sustain recovery under some viable legal theory." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quotation omitted). "Conclusory allegations or legal conclusion masquerading as factual allegations will not suffice." *Id.* (citing *Meziboy v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)). In sum, an action will be dismissed under this standard where "there is no law to support the claims made." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013) (citing *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978)). The same holds where "the facts alleged are insufficient to state a claim." *Id.*

**B.    Hollis And Pascol's Claims Are Not Time Barred, But The Warden Is Entitled To Judgment On The Pleadings.**

The Defendants raise two issues in their Motion. First they claim that the Complaint is time barred. Second, even if the Complaint was timely, they argue that the two personal-capacity § 1983 claims asserted against the Warden—a portion of Count I and the entirety of Count VI—are fatally flawed. In particular, they claim that he is entitled either to judgment on the pleadings or to qualified immunity. As resolving the statute of limitations issue cuts across all of Hollis and Pascol's claims, the Court starts there, before turning to the Warden-specific arguments.

**1.    *Hollis And Pascol's Claims Are Not Time Barred.***

Only if it is apparent on the face of the complaint that Hollis and Pascol's suit is time-barred would judgment on the pleadings in favor of the Defendants on statute of limitations grounds be proper. *See Phelps v. McClellan*, 30 F.3d 658, 662 (6th Cir. 1994). Of course, a prerequisite to bringing a § 1983 claim, like any other claim, is that it must be brought within the applicable statute of limitations period. And it is settled that state law governs the statute of limitations applicable to a § 1983 action, but federal law governs when that period begins to run. *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law.").

As to the former, "the appropriate statute of limitations for 42 U.S.C. § 1983 civil rights actions arising in Ohio is contained in Ohio Rev. Code § 2305.10, which requires that all actions for bodily injury be filed within two years after their accrual." *Browning v. Pendleton*, 869 F.2d 989, 992 (6th Cir. 1989) (en banc). And as to the

latter, under federal law, the statute of limitations period begins to run when the claim accrues, which is when the plaintiff "knows or has reason to know of the injury which is the basis of his action." *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (quotation omitted); *see also Wallace*, 549 U.S. at 388 ("[I]t is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief." (quotation and citation omitted)); *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984) (citing *Keating v. Carey*, 702 F.2d 377, 382 (2d Cir. 1983)) ("The statute of limitations commences to run when the plaintiff knows or has reason to know of the injury which is the basis of his action."). "Stated differently, 'in determining when the cause of action accrues in § 1983 cases, we look to the event that should have alerted the typical lay person to protect his or her rights.'" *Cooey*, 479 F.3d at 416 (quoting *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 856 (6th Cir. 2003)).

Arguing that a prisoner's claim is untimely is an affirmative defense. *See Surles v. Andison*, 678 F.3d 452, 458 (6th Cir. 2012) (citing Fed. R. Civ. P. 8(c) ("The statute of limitations, like exhaustion of administrative remedies, is an affirmative defense."). "As such, Defendants [bear] the ultimate burden of proof on that issue." *Id.* (citing *Fonseca v. Consolidated Rail Corp.*, 246 F.3d 585, 590 (6th Cir. 2001)). "A complaint is subject to dismissal without any further proof if 'the allegations show that relief is barred by the applicable statute of limitations.'" *Id.* (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007).

On the facts here, there is little question that, as Defendants argue, the day of the alleged attack, June 4, 2017, is the day Hollis's and Pascol's action accrued. Defendants argue this means the statute of limitations period expired two years later, on June 4, 2019, making the June 7, 2019 Complaint untimely by three days.

While this two-year-from-accrual calculation seems straightforward, there is a wrinkle. The claims here are subject to the Prison Litigation Reform Act ("PLRA"), which applies to all "federal claims seeking redress for prison circumstances or occurrences[.]" *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015). The PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined to any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "This language unambiguously requires exhaustion as a mandatory threshold requirement in prison litigation." *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000).

This exhaustion requirement seems to leave prisoners with civil rights claims in a Catch-22: fully exhaust their administrative remedies only to find that their claims in court are time barred, or file a claim in court before fully exhausting their administrative remedies and risk being dismissed under the PLRA. Recognizing this, the Sixth Circuit has repeatedly held that the statute of limitations applicable to a prisoner's civil rights claim is tolled while the plaintiff exhausts the required administrative remedies. *See Brown*, 209 F.3d at 596 ("[T]he statute of limitations which applied to [plaintiff's] civil rights action was tolled for the period during which

his available state remedies were being exhausted."); *Waters v. Evans*, 105 F. App'x 827, 828–29 (6th Cir. 2004) (same).

Thus, as part of their burden on the statute of limitations issue, "[d]efendants [are] required to show that [a prisoner's] claims were untimely even after tolling for the period during which [he was] exhausting [his] administrative remedies." *Surles*, 678 F.3d at 458 (denying summary judgment because the defendants "did not offer enough evidence" of untimeliness, and there was a genuine dispute "as to how much time should be tolled" while the prisoner "was exhausting, or attempting to exhaust, his administrative remedies"); *see also, e.g.*, *Daugherty v. K.S.P. Med. Dep't*, No. 5:17-CV-P41, 2018 WL 1095820, at *3 (W.D. Ky. Feb. 27, 2018) (noting both failure to exhaust and statute of limitations arguments are "affirmative defenses, and Defendants bear the burden of proving" them); *Thomas v. Slusher*, No. 1:17-cv-794, 2018 WL 931301, at *4 (N.D. Ohio Feb. 16, 2018) (citing *Surles*, 678 F.3d at 456–58 (citing *Jones v. Bock*, 549 U.S. 1999 (2007))) (requiring the defendants, in arguing a prisoner failed to exhaust and that his claims are untimely, to bear the burden as to those defenses). As the court in *Daughtry* noted, after *Jones*, "the Sixth Circuit has concluded that the exhaustion affirmative defense is best raised in a motion for summary judgment … because proof of lack of exhaustion generally requires resort to matters outside the pleadings, such as affidavits and documentary evidence." *Daughtry*, 2018 WL 1095820 at *3. Such is the case with statute of limitations arguments too. *See id.* ("Without evidence regarding … when any such administrative grievances were filed or finished, the Court cannot calculate how long

the statute of limitations may have been tolled or whether the statute of limitations has run on Plaintiff's equal protection claims.").

Accordingly, in arguing that the statute of limitations has run, it was the Defendants' responsibility to account for any tolling that may have occurred. They failed to do so. (*See* Defs.' Mot. at #64 (arguing the claim accrued on June 4, 2017, that the complaint was filed on June 7, 2019, and was therefore untimely)). In fact, they did not even really try.

Rather than accounting for any tolling that would have arisen based on Hollis's and Pascol's specific allegation that they participated in SOCF's grievance process, (*see* Compl. at ¶¶ 58–59, #10), Defendants instead argue that federal law does not provide for such tolling. In making this argument, Defendants ask this Court to disregard settled precedent from the Sixth Circuit (and several other Circuits) holding the opposite. *See Brown*, 209 F.3d at 596; *see also, e.g.*, *Johnson v. Garrison*, --- F. App'x ----, 2020 WL 1487653, at *4 (10th Cir. Mar. 24, 2020) (citing *Brown*, 209 F.3d at 596) (holding that Oklahoma's lack of a tolling provision to allow for PLRA exhaustion is "contrary to § 1983's goals" and that the statute of limitations should be tolled under federal equitable principles); *Battle v. Ledford*, 912 F.3d 708, 718–20 (4th Cir. 2019) (providing for tolling of a prisoner's § 1983 claim despite a state "no-tolling" provision); *Gonzalez v. Hasty*, 651 F.3d 318, 325 (2d Cir. 2011) (noting several Circuits "have all adopted the rule that equitable tolling is applicable to the time period during which a prisoner-plaintiff is exhausting his administrative remedies pursuant to the PLRA"); *Brown v. Valoff*, 422 F.3d 926, 942–43 (9th Cir. 2005) ("We

14

do not regard the intersection of the exhaustion and statute of limitations requirements as creating problems for prisoners, however, as we agree with the uniform holdings of the circuits … that the applicable statute of limitations must be tolled while a prisoner completes the mandatory exhaustion process."); *Clifford v. Gibbs*, 298 F.3d 328, 333 (5th Cir. 2002) ("We conclude that equitable tolling in this case is likewise appropriate … [and[ we grant [the plaintiff-prisoner's] request to equitably toll limitations on his § 1983 action during … any additional state administrative proceedings.").

In support of their no-tolling argument, Defendants ask this Court to hold that two Sixth Circuit cases, *Brown*, 209 F.3d at 596, and *Surles*, 678 F.3d at 458, which specifically discuss the availability of such tolling, were "implicitly overruled by *Ross* [*v. Blake*, 136 S. Ct. 1850 (2016)] and [*Jones v.*] *Bock*[, 549 U.S. 199 (2007)]." (Defs.' Mot. at #95–96). Defendants claim that these two more recent Supreme Court decisions mandate strict adherence to the PLRA's text, and Defendants note that the PLRA's text does not include any reference to tolling. Thus, according to Defendants, post-*Ross* and *Bock*, the Supreme Court's earlier decisions in *Hardin v. Straub*, 490 U.S. 536 (1989), and *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478 (1980), which consigned questions of tolling exclusively to state law, now control. And here, Ohio law does not provide for administrative tolling in this context.

But "[t]he undersigned is bound by the controlling Sixth Circuit precedent in the absence of any Supreme Court decision clearly overturning such precedent." *Goens v. Warden, Lebanon Corr. Inst.*, No. 1:09-cv-650, 2010 WL 3399335, at *3 n.7

15

(S.D. Ohio Apr. 14, 2010) (Black, J.) (declining to hold that equitable tolling is inapplicable to habeas corpus cases). When an "intervening decision neither expressly or implicitly overrules the prior Court of Appeals decision, a district court must be extremely careful in concluding that circuit precedent is no longer good law[.]" *Hammonds v. United States*, No. 2:05-CR-52; 2:16-CV-61, 2017 WL 922678, at *2 (E.D. Tenn. Mar. 3, 2017) (quotations and citations omitted). A district court "should only deviate from such authority where it is powerfully convinced that the circuit will overrule itself at the next available opportunity." *Id.* (quotations and citations omitted). "This is a district court, and it must follow binding precedent when such precedent exists." *D'Ambrosio v. Bagley*, 688 F. Supp. 2d 709, 721 (N.D. Ohio 2010).

Here, this Court is not "powerfully convinced" that *Brown*'s overruling is imminent. If anything, the Defendants' report of its demise seems greatly exaggerated. The Sixth Circuit, even after *Ross* and *Bock*, has cited *Brown* for the exact proposition at issue here—that claims subject to the PLRA are tolled while a prisoner exhausts administrative remedies. *See Franklin v. Fischer*, No. 16-6464, 2017 WL 4404624, at *3 (6th Cir. May 15, 2017) ("[T]he statute of limitations applicable to a prisoner's civil rights action is tolled for the period during which his available state remedies were being exhausted, [but] such tolling does not apply to the pursuit of remedies outside the prison grievance system." (quotation omitted) (citing *Brown*, 209 F.3d at 596)). And the recent Tenth and Fourth Circuit decisions, which were likewise issued after *Ross* and *Bock*, continue to find federal equitable tolling applicable to § 1983 claims that are subject to the PLRA. *See Battle*, 912 F.3d

16

at 718–20; *Garrison*, 2020 WL 1487653 at \*4 (10th Cir. Mar. 24, 2020) (citing *Brown*, 209 F.3d at 596). The Sixth Circuit is of course free to revisit *Brown*, in light of *Ross* and *Bock*, but unless and until it does so, this Court declines to assume that the decision is ineluctably consigned to the scrap heap.

Given the availability of such tolling, Defendants have not carried their burden of demonstrating that the claims here are untimely. As already noted, Hollis and Pascol specifically allege in their Complaint that they pursued administrative remedies by grieving their claims through SOCF's internal process, to no avail. (Compl. at ¶¶ 58–59, #10). Drawing all inferences in their favor, as the Court must at this stage of the proceedings, it is plausible—indeed, exceedingly likely—that their participation in SOCF's grievance process would have lasted long enough to toll the statute of limitations for the three days needed to make their June 7, 2019 Complaint timely.

As the Court concludes that Hollis and Pascol are entitled to tolling for the time that they were involved in the prison's grievance process, and as that tolling almost certainly bridges the three-day gap here, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings on the statute of limitations issue. (Of course, if the actual facts relating to plaintiffs' participation in the grievance process reveal that three days of tolling is not warranted, the Court can re-address this issue on summary judgment.)

## 2.     *The Claims Against The Warden Should Be Dismissed.*

While the Court declines to dismiss the case on limitations grounds, the Court will grant the Defendants' Motion as it relates to the § 1983 claims against the Warden. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Hollis and Pascol cannot hold the Warden personally liable under § 1983 merely on a basis of *respondeat superior*. *See Winkler v. Madison Cty.*, 893 F.3d 877, 898 (6th Cir. 2018) (citing *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984)); *see also Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 691–92 (1978) (holding that *respondeat superior* liability does not exist under § 1983). Rather, individuals sued in their personal capacity under § 1983 are liable only for their *own* unconstitutional behavior. *See Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011) ("Personal involvement is necessary to establish section 1983 liability.").

To hold a supervisory official personally liable under § 1983, a plaintiff must demonstrate that the official actively engaged in some unconstitutional behavior. *Id.*; *see also Iqbal*, 556 U.S. at 676 (2009) ("Because vicarious liability is inapplicable to … § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("Persons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior."). This means "the supervisor must have abdicated his specific job responsibility, with the '*active performance* of the supervisor's individual

job function … directly resulting in the constitutional injury.'" *Winkler*, 893 F.3d at 898–99 (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (emphasis in original)). Personal involvement requires "at a minimum" that a state actor "at least implicitly authorized, approved, or knowingly acquiesced" to the underlying constitutional violation. *Graves v. Malone*, --- F. App'x ----, No. 18-2296, 2020 WL 1900458, at *5 (6th Cir. Apr. 17, 2020) (quotation omitted); *see also Wingo v. Tenn. Dep't of Corr.*, 499 F. App'x 453, 455 (6th Cir. 2012) (per curiam) ("In order to find supervisory personnel liable, a plaintiff must allege that the supervisors were somehow personally involved in the unconstitutional activity of a subordinate, or at least acquiesced in the alleged unconstitutional activity of a subordinate." (quotation and citation omitted)); *Bellamy*, 729 F.2d at 421 ("At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."). Similarly, a supervisor's failure to act, without more, is insufficient to establish supervisory liability. *See Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) ("[A] mere failure to act will not suffice to establish supervisory liability." (citations omitted)).

Relatedly, a failure to protect claim requires Hollis and Pascol to plausibly allege that the Warden "acted with 'deliberate indifference' to a substantial risk of serious harm." *Hester v. Morgan*, 52 F. App'x 220, 222 (6th Cir. 2002) (citing *Farmer v. Brennan*, 511 US 825, 834 (1994)). "Deliberate indifference is a state of mind more blameworthy than negligence, but it entails 'something less than acts or omission for

the very purpose of causing harm or with knowledge that harm would result.'" *Id.* (quoting *Farmer*, 511 U.S. at 835). The Warden "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quotation omitted).

In their Complaint, Hollis and Pascol allege two personal-capacity § 1983 claims against the Warden, asserting, at various points that:

> 66.   Defendant Faye, Defendant Dalton and Defendant Warden all knew that Gregory Reinke was dangerous and had stabbed inmates before, yet still permitted him to be in general population during recreational time.
>
> …
>
> 74.   Defendant Warden … owed Plaintiffs a duty to act and not be deliberately indifferent to known serious risks of physical harm against inmates. His neglect to do anything to keep Gregory Reinke away from other inmates … violated Plaintiffs' constitutionally protected right to be free from bodily harm.
>
> …
>
> 121.   … Defendant Warden was a warden and supervisor acting under the color of law in his/her actions and omissions and at least implicitly approved, authorized or acquiesced in the unconstitutional conduct exhibited by his/her subordinate defendants named herein. … Defendant Warden established policies for his/her subordinates to follow which permitted the Defendant Officers to carry out the constitutional violations described herein.
>
> …
>
> 125.   Despite his knowledge of a threat to inmate safety, Defendant Warden did not train and supervise Defendant Officers on dealing with inmates who pose a threat to other inmates' safety.

(Compl., ¶¶ 66, 74, 121, 125, #11–12, 19–20).

These personal-capacity claims against the Warden fail for three reasons. First, the failure-to-protect claim falters because there is no factual allegation in the

Complaint that indicates the Warden was directly involved or that he implicitly encouraged, acquiesced or authorized the alleged attack. To be sure, the Complaint *says* that the Warden "implicitly approved, authorized or acquiesced in the unconstitutional conduct[.]" (*See, e.g.*, Compl. at ¶ 121, #19). But the complaint fails to allege any *facts* that plausibly support that conclusion, and conclusions absent facts don't cut it. *Twombly*, 550 U.S. at 570.

That is, even assuming Reinke posed a "substantial risk of serious harm" to Hollis and Pascol, there are still no facts in the Complaint that plausibly alleges the Warden knew about, and then consciously disregarded, that risk. *See, e.g.*, *Hester*, 52 F. App'x at 222–23 (granting summary judgment on a failure to protect claim because "even if the living conditions [at the prison] did present a substantial risk of serious harm, [the prisoner] has not provided evidence that, when viewed in the light most favorable to him, demonstrates that [the Warden] knew of that risk").

At best, the Complaint offers a vague assertion that the Warden "knew that Gregory Reinke was dangerous and had stabbed inmates before." (Compl. at ¶ 66, #11). That allegation alone is insufficient to state a plausible claim against the Warden for failing to protect Hollis and Pascol *in this particular instance*. Hollis and Pascol have thus failed to allege facts from which the Court can infer that the Warden was deliberately indifferent to the known risk of harm as it applied to them, which is necessary to state a prima-facie-failure-to-protect claim. *See Farmer*, 511 U.S. at 828. "Although the assault on the plaintiff was unfortunate, and the injuries he suffered

regrettable … [d]espite precautions, it is impossible to stop all random acts of violence in the prison environment." *Hester*, 52 F. App'x at 225.

Second, while Hollis and Pascol allege the Warden failed to act, this is not enough to hold him liable under § 1983. *See Peatross*, 818 F.3d at 241 ("[A] mere failure to act will not suffice to establish supervisory liability.").

Finally, the "Supervisory Individual Liability" claim (Count VI) fails because it "improperly conflates a § 1983 claim of individual supervisory liability with one of municipal liability." *Harvey v. Campbell Cty.*, 453 F. App'x 557, 563 (6th Cir. 2011) (quotation omitted) (citing *Miller v. Calhoun Cty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)); *see also Phillips v. Roane Cty.*, 534 F.3d 531, 543, (6th Cir. 2008) (same). Cases like *Harvey* and *Phillips* make clear that:

> [a] supervisor is not [individually] liable pursuant to § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct."

*Phillips*, 534 F.3d at 543 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). As noted above, there are insufficient allegations on that front here.

Plaintiffs seek to escape that result by pointing to *Harris v. Ervin*, No. 1:18-cv-142, 2019 WL 1317848, at *3 (S.D. Ohio Mar. 22, 2019), and *Peatross*, 818 F.3d at 242. (*See* Pls.' Opp'n at #83–85). Those cases do not help them, though. To be sure, *Harris* notes that, "[w]here an official's execution of his or her job function causes injury to the plaintiff, the official may be liable under the supervisory-liability theory." *Harris*, 2019 WL 1317848, at *3 (quotation and citation omitted). But such

22

liability turns on a showing of a "causal connection between a defendant's wrongful conduct and the alleged violation." *Id.* (citing *Peatross*, 818 F.3d at 242).

The "causal connection" in *Harris* and *Peatross* was much different from what Plaintiffs allege here. In both of those cases, the supervisor at issue had knowledge of specific prior instances of misconduct by a subordinate, the subordinate again took that same or similar action, and a constitutional violation ensued. *See id.* ("In particular, Plaintiff alleges that Erdos was on notice of the need to provide adequate medical care to inmates sprayed with chemical spray … failed to supervise and train employees charged with doing so … [and] was on notice that [the Defendant Officer] had used excessive force against inmates on multiple occasions."); *Peatross*, 818 F.3d at 243 (finding a supervisory liability claim was plausible when the supervisor was aware of fifty-four officer shootings in five years, that there was a "dire need" to review police operations, and the supervisor both did nothing and gave officers a "green light" to violate citizens' civil rights). Here, by contrast, the requisite connection is both much more attenuated and not plausibly alleged. Namely, Hollis and Pascol fail to allege that the Warden was aware of any prior occasion where Officers Faye or Dalton failed to prevent or encouraged inmates to stab or attack others, failed to search inmates prior to recreational time, or were impermissibly slow to respond to inmate violence, let alone that the Warden, by "execution of his job function[,]" implicitly permitted all this to occur in connection with this "specific incident of misconduct." *Phillips*, 534 F.3d at 543.

In short, there is simply no allegation that directly ties the Warden's alleged failure to train or failure to supervise to the specific incident here. This case is not one, for example, where a supervisor watched fellow guards beat a prisoner, and failed to exercise his supervisory authority to stop the attack. Nor is it even a situation where a supervisor stood silently by and watched other guards fail to step in to halt a prisoner-on-prisoner attack. Rather, the allegation is merely that the Warden generally knew of a potential risk that could potentially result in harm of some kind at some point in time, and should have done more to prevent that possible harm. That is not enough for personal liability.

Rather, failure-to-train or failure-to-supervise claims of the nature alleged here could give rise to, at most, *official-capacity* claims against the Warden, which would in turn create liability for the governmental entity, not for the supervisor himself.[3] But that approach runs headlong into two additional problems. First, Plaintiffs do not assert an official-capacity claim. To the contrary, they make it clear that they are seeking to hold the Warden "individually liable." (Compl. at ¶¶ 14, 120, #5, 19). They likely did so because of the second problem—the Warden is a state employee, and "neither a State nor its officials acting in their official capacities are

---

[3] That is not to suggest that such claims would lie here. Even official-capacity failure-to-train or failure-to-supervise claims require a showing that those failures constituted deliberate indifference to a known risk. *See, e.g.*, *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355–56 (6th Cir. 2013) (comparing personal-capacity claims with official-capacity claims against a municipality and noting the latter "is a broader claim concerning the custom or policy of a municipality, and thus would implicate the conduct of a defendant supervisor insofar as he acted with deliberate indifference in his official capacity as policymaker" (citations omitted)). As discussed above, Plaintiffs are not making (and cannot make) official-capacity claims here, though, so the Court need not consider whether the Plaintiffs could sufficiently plead deliberate indifference.

24

'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). In short, Count VI is fatally flawed, whether considered as a personal-capacity claim or as an official-capacity claim.

As neither Count I nor Count VI set forth a viable § 1983 claim against the Warden, discussion of qualified immunity is unnecessary. Therefore, the Court **GRANTS** Defendants' Motion on this point and **DISMISSES** the claims against the Warden in Count I and Count VI **WITH PREJUDICE**.

### C. Hollis And Pascol's Motion For Leave To Amend Is Granted.

While the Defendants' Motion was pending, on January 15, 2020, Hollis and Pascol filed a Motion for Leave to Amend their Complaint, (Pls.' Mot., Doc. 19, #122), which the Defendants opposed. (Defs.' Resp. in Opp'n to Pls.' Mot. ("Defs.' Opp'n"), Doc. 21, #167). Hollis and Pascol argue Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to amend pleadings, and because there has been no undue delay or bad faith on their part, nor would amendment be futile, leave is appropriate in this instance. (Pls.' Mot. at #123–25).

Defendants advance a number of arguments in opposition, including that the motion should be denied because the Complaint was untimely (discussed above) and that the failure to attach the proposed amended complaint is fatal. (Defs.' Opp'n at #167–69). They further argue that adding defendants, as opposed to merely substituting mistaken parties, is barred by the statute of limitations. (*Id.* at #169– 70). In reply, Hollis and Pascol argue that they described the proposed amended complaint with enough particularity, and that regardless, they are not trying to

amend the claims or add facts but merely seeking "to add new parties who have received satisfactory notice." (Pls.' Reply to Defs.' Opp'n, Doc. 22, #173).

A district court has broad authority to decide whether or not to grant a party leave to amend their pleadings. *See Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 330 (1971) ("It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court."); *Foman v. Davis*, 371 U.S. 178, 187 (1971) (opining that an "outright refusal to grant the leave without any justifiable reason" would likely constitute an abuse of discretion).

The issue here, it seems, is futility, which, in the context of the parties' arguments, turns on whether adding new defendants is timely (and permitted), or untimely (which would require further analysis). But on that front, with no information before this Court as to when any tolling associated with the grievance process ended, or whether there may be other forms of tolling available, the Court is unable to say when the statute of limitations ran (or, perhaps, will run). Accordingly, the Court cannot be certain that amending the Complaint would be futile on timeliness grounds. That being said, it is certainly at least possible that the statute of limitations has in fact now run, meaning any attempt to add new defendants would require analyzing whether those additions relate back to the timely Complaint. Wholly lacking information about any tolling that may have occurred, it is not appropriate for this Court to speculate as to the outcome on these various issues, and thus not appropriate to deny Hollis and Pascol's Motion on those grounds.

Accordingly, the Court grants Hollis and Pascol leave to amend their Complaint to identify John Doe defendants, but in doing so, makes two points. First, because the Court has yet to see the Amended Complaint, the Court makes no ruling on whether that filing will be timely as to any new defendants identified. Second, and relatedly, the Court advises Hollis and Pascol to be mindful of the timing issues outlined above, and encourages them to consider, and address through appropriate allegations, the relevant statute of limitations issues before filing any Amended Complaint. That being said, the Court **GRANTS** Plaintiffs' Motion for Leave to File an Amended Complaint, in which they may identify parties currently named as John Doe defendants. Any such Amended Complaint shall be filed within fourteen days from the entry of this Order.

## CONCLUSION

Based on the above, the Court **DENIES** Defendants' Motion for Judgment on the Pleadings (Doc. 12) as it pertains to the statute of limitations issue, but **GRANTS** the Motion as it pertains to the Warden, who is **DISMISSED** from this action **WITH PREJUDICE**. Further, the Court **GRANTS** Plaintiffs' Motion for Leave to File an Amended Complaint (Doc. 19) and instructs them to do so within fourteen days from the entry of this Order.

**SO ORDERED.**

May 12, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**